**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HUNTER TECHNOLOGY CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 20-cv-4858 |
| v. | ) | |
| | ) | Judge Marvin E. Aspen |
| OMEGA GLOBAL TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Judge:

Plaintiff Hunter Technology Corporation ("Hunter") is suing Defendant Omega Global Technologies, Inc. ("Omega") for breach of contract. Omega now moves for summary judgment on Hunter's claim. (Defendant's Motion for Summary Judgment (Dkt. No. 74); Defendant's Memorandum in Support of Its Motion for Summary Judgment ("Def.'s Summ. J. Mem.") (Dkt. No. 75).)[1] Omega also moves to exclude Hunter's damages expert's opinion and other damages-related information. (Defendant's Motion to Exclude (Dkt. No. 76); Defendant's Memorandum in Support of Its Motion to Exclude ("Mem. to Exclude") (Dkt. No. 77).) Hunter cross-moves for summary judgment on the issue of liability. (Plaintiff's Motion for Summary Judgment (Dkt. No. 79); Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Summ. J. Mem.") (Dkt. No. 80).) For the following reasons, we grant in part and deny in part Omega's motion to exclude, grant in part and deny in part Omega's summary judgment motion, and deny Hunter's summary judgment motion.

---

[1] For ECF filings, we cite to the page number(s) set forth in the document's ECF header unless citing to a particular paragraph or other page designation is more appropriate.

## FACTUAL BACKGROUND

We take the following facts from the parties' Local Rule 56.1 submissions,[2] the materials cited therein, and other aspects of the record in this case. All facts are genuinely undisputed unless otherwise noted.

Hunter makes printed circuit boards ("PCBs"). (Def.'s Resp. to Pl.'s SOF ¶ 1.) It purchases raw materials or subcomponents from third parties to make the end products for its customers. (*See* Pl.'s Resp. to Def.'s SOF ¶¶ 8–9.) Omega sources and sells hard-to-find electronic components, including components that are used in manufacturing PCBs. (*Id.* ¶ 10; Def.'s Resp. to Pl.'s SOF ¶ 2.) Omega has been selling components to Hunter since at least 2014. (Pl.'s Resp. to Def.'s SOF ¶ 13.)

On June 26, 2018, Kit Chakkaphak, a buyer employed by Hunter, emailed purchase order #089794-00 (the "June 2018 Purchase Order") to Omega employee Stephanie Somera. (*Id.* ¶ 17; Def.'s SOAF ¶ 1; June 2018 Purchase Order (Dkt. No. 81-2).) The June 2018 Purchase Order requested 4,600 power inductors manufactured by Coilcraft and 67,500 MOSFETs[3]

---

[2] *See* Defendant's Rule 56.1 Statement of Material Facts Not in Dispute ("Def.'s SOF") (Dkt. No. 78); Plaintiff's Statement of Material Facts ("Pl.'s SOF") (Dkt. No. 81); Defendant's Response to Plaintiff's Rule 56.1 Statement of Material Facts ("Def.'s Resp. to Pl.'s SOF") (Dkt. No. 91 at 1–17); Defendant's Statement of Additional Material Facts ("Def.'s SOAF") (Dkt. No. 91 at 17–20); Plaintiff's Statement of Additional Material Facts ("Pl.'s SOAF") (Dkt. No. 92 at 2–7); Defendant's Response to Plaintiff's Statement of Additional Material Facts ("Def.'s Resp. to Pl.'s SOAF") (Dkt. No. 97); Plaintiff's Response to Defendant's Rule 56.1 Statement of Material Facts Not in Dispute ("Pl.'s Resp. to Def.'s SOF") (Dkt. No. 99-1). Hunter did not respond to Omega's statement of additional material facts, so we deem those additional facts admitted for purposes of Hunter's summary judgment motion. *See* N.D. Ill. L.R. 56.1(e)(3).

[3] In their opening summary judgment memoranda, Omega refers to these components as "Diodes," while Hunter refers to them as "MOSFETs." (*E.g.*, Def.'s Summ. J. Mem. at 1; Pl.'s Summ. J. Mem. at 3.) Omega later adopted Hunter's use of "MOSFETs" to maintain consistency (Defendant's Response to Plaintiff's Motion for Summary Judgment ("Def.'s Summ. J. Opp'n") (Dkt. No. 90) at 1 n.1), so we do the same.

manufactured by Diodes, Inc., part numbers BSS138DW-7 and BSS138DW-7-F. (Pl.'s Resp. to Def.'s SOF ¶ 17; Def.'s SOAF ¶¶ 1–2; June 2018 Purchase Order at OMEGA_000231.)

At the bottom of the June 2018 Purchase Order is the following:

> TERMS AND CONDITIONS OF PURCHASE
>
> The following terms and conditions shall form part of any agreement executed by the parties hereto or purchase order to which they are attached (together all documents form a "Contract") between Hunter Technology dba Sparton Milpitas (the "Company") and the party described on the face page of the Purchase Order attached hereto ("Supplier").

(June 2018 Purchase Order at OMEGA_000231.) The purchase order itself does not list Hunter's terms and conditions of purchase, but it includes a link to a document titled "General Provisions for Subcontracts and Purchase Orders," which sets forth these terms and conditions. (*Id.* at OMEGA_000232; Pl.'s Resp. to Def.'s SOF ¶ 17; Def.'s SOAF ¶ 5; General Provisions for Subcontracts and Purchase Orders ("Hunter's Terms and Conditions") (Dkt. No. 81-3).) Hunter's Terms and Conditions require the MOSFETs to be traceable back to their manufacturer and has the seller (Omega) warrant "that at the time of delivery the Supplies will be free from any defects in material or workmanship and will conform to the requirements of this Order." (Def.'s Resp. to Pl.'s SOF ¶ 11; Hunter's Terms and Conditions ¶ 44.) The Terms and Conditions further state that "[a]ny acknowledgement that contains terms in addition to, or inconsistent with, the terms and conditions of this Order, or a rejection of any term or condition of this Order, shall be deemed a counter-offer to [Hunter] and shall not be binding on [Hunter] unless acceptance thereof is made in writing by [Hunter]." (Pl.'s Resp. to Def.'s SOF ¶ 18.)

Chakkaphak's email asked Somera to "accept and confirm" the June 2018 Purchase Order. (Dkt. No. 78-11 at 3.) In response, Somera emailed a Confirmation of Non-Cancellable Non-Returnable Purchase Order form ("NCNR") to Chakkaphak and asked him to sign and

return the NCNR before she accepted and confirmed the purchase order. (*Id.*; Def.'s Resp. to Pl.'s SOF ¶ 13.) Somera further stated that "[a]s a company policy, NCNR is required for a long lead time order." (Dkt. No. 78-11 at 3; Def.'s Resp. to Pl.'s SOF ¶ 14.) The NCNR, however, used the incorrect quantity, and Somera shortly thereafter emailed Chakkaphak a revised NCNR to sign and send back. (Dkt. No. 78-11 at 2–3.) The revised NCNR (which we hereinafter refer to as the NCNR) states that:

> Buyer acknowledges that it has authorized Seller to procure, on Buyer's behalf, the parts identified below in the open market and that the Seller will expend its own funds to procure such parts. These parts have been allocated according to the Buyer's purchase order. Consequently, Buyer acknowledges and agrees that it shall not cancel or reschedule this purchase order or seek to return the parts for any reason other than in the event such parts are defective. Defective product must be reported within 30 days and written technical failure report provided. Agreements are subject to availability or prior sale.

(NCNR (Dkt. No. 78-10).) The NCNR further states that "[p]arts can only be returned if they fail" and the "[c]ustomer must also provide testing results of why parts failed." (*Id.*) The NCNR refers to the MOSFETs and the power inductors that were identified in the June 2018 Purchase Order, but it references a different purchase order number (#HD20180517013). (*Id.*; June 2018 Purchase Order at OMEGA_000231; Def.'s SOAF ¶ 3.) Chakkaphak signed the NCNR, as did Zedric Ochoa, Omega's Manager. (NCNR.)

A few months later, Omega sought to increase the price of the MOSFETs. (Pl.'s Resp. to Def.'s SOF ¶ 20.) Relying on the terms of the NCNR, Chakkaphak demanded that Omega honor the original price. (*Id.*) In an email sent on October 3, Chakkaphak stated that his interpretation of the NCNR was "that you the seller will bring in the product at your own cost and we the buyer should retain the price on our PO since that is the price we agreed upon." (Dkt. No. 78-11 at 1–2.) Omega agreed not to increase the price. (Pl.'s Resp. to Def.'s SOF ¶ 20.)

Omega subsequently shipped the MOSFETs to Hunter in two batches.[4]  Hunter received

the first batch on either October 19 or October 23, 2018.  (*Compare* Answer and Affirmative

Defenses ("Def.'s Answer") (Dkt. No. 29) ¶ 10 (October 19), *with* Transcript of Roberto Tongo's

Deposition ("Tongo Dep.") (Dkt. No. 78-5) at 80:19–81:8 (October 23).)  On October 23,

Omega emailed Hunter an invoice for the first shipment.  (Def.'s Resp. to Pl.'s SOF ¶ 8; Pl.'s

Resp. to Def.'s SOF ¶ 22; Def.'s Answer ¶ 11.)  Hunter paid this invoice on December 14.  (Pl.'s

Resp. to Def.'s SOF ¶ 23.)  On either December 18 or December 20, 2018, Hunter received the

second batch of MOSFETs.  (*Compare* Def.'s Resp. to Pl.'s SOF ¶ 9 (December 18), *and* Def.'s

Answer ¶ 12 (same), *with* Pl.'s Resp. to Def.'s SOF ¶ 26 (December 20).)  Omega issued its

invoice for this batch on December 20.  (Pl.'s Resp. to Def.'s SOF ¶ 27.)  The parties do not say

whether Hunter paid this invoice.

The October 23 and December 20 invoices, like the invoices Omega had issued to Hunter

for other transactions that took place earlier in the year, included Omega's own terms and

conditions.  (*Id.* ¶ 22; Def.'s Resp. to Pl.'s SOF ¶ 8; Def.'s SOAF ¶ 8.)  Hunter never objected to

the terms and conditions on Omega's invoices.  (Def.'s SOAF ¶ 10.)

After shipping each batch of MOSFETs, Omega also provided Hunter with a packing list

for the batch.  (Def.'s Resp. to Pl.'s SOF ¶¶ 7, 9.)  Both packing lists include a "Certificate of

Compliance" whereby Joe Ochoa, Omega's CEO, certifies that "all articles in the quantities

called for in the" June 2018 Purchase Order conform "with the requirements and specifications

listed on that order which have been accepted by Omega GTI."  (Affidavit of Jose Ochoa (Dkt.

No. 78-2) ¶ 2; Dkt. Nos. 81-4, 81-6.)

---

[4] The first batch contained 36,000 MOSFETs, and the second batch contained 31,500 MOSFETs.
(*See* Dkt. Nos. 78-12, 78-15.)

Other than performing its standard receiving procedures, Hunter did not test the first batch of MOSFETS in the one-month period following delivery. (Pl.'s Resp. to Def.'s SOF ¶ 25.) Hunter also did not test the second batch of MOSFETS for defects in the one-month period following delivery. (*Id.* ¶ 29.) Nor did Hunter report that the MOSFETS were defective or provide Omega with any test reports during these timeframes. (*Id.* ¶¶ 24, 28.)

At some point, Hunter began to incorporate the MOSFETS into two products it was making for a customer: the Charger and the Trial Simulator (collectively, the "End Products"). (*Id.* ¶ 30; Tongo Dep. at 12:23–13:15.) Hunter assembled at least 1,300 End Products using the MOSFETS and shipped them to the customer. (Pl.'s Resp. to Def.'s SOF ¶ 31.)

In early February 2019, Hunter informed Omega of a possible quality issue with the MOSFETS, reporting a 30 percent failure rate. (Def.'s Resp. to Pl.'s SOF ¶ 17; Dkt. No. 81-10 at OMEGA_000272; Transcript of Zedric Ochoa's Deposition ("Z. Ochoa Dep.") (Dkt. No. 81-11) at 33:1–15.) Hunter suspected that the MOSFETS were counterfeit, but Omega resisted this conclusion. (Def.'s Resp. to Pl.'s SOF ¶ 18.) Both parties commissioned a report on the MOSFETS from a third-party testing house. (*Id.* ¶¶ 20–23.) Both reports stated that evidence of counterfeiting was found "with the lot or test samples during the inspection" and recommended that the MOSFETS not be used in any application. (*Id.* ¶ 24; Dkt. No. 81-12 at 3; Dkt. No. 81-13 at 3.) In a February 18 email to the vendor from whom Omega obtained the MOSFETS, an Omega employee stated that the testing house "found a multitude of failures" with the MOSFETS, "reflecting what our customer has reported to us." (Dkt. No. 92-23.) A few days later, Joe Ochoa, in apparent reference to the MOSFETS, stated in an email that our team has "acknowledged that this material is questionable." (Dkt. No. 81-15 at OMEGA_000121.)

Omega issued a return material authorization (RMA) and agreed to take the MOSFETs back. (*Id.*; Def.'s Resp. to Pl.'s SOF ¶¶ 40–41; Dkt. No. 81-21.)

The issues with the MOSFETs made Hunter suspicious of other components it had purchased from Omega. (Tongo Dep. at 102:15–24.) In mid-February 2009, Hunter quarantined all parts supplied by Omega. (*Id.*)

## PROCEDURAL HISTORY

Hunter filed suit against Omega in the Circuit Court of Cook County, Illinois, alleging that Omega had breached a contract formed pursuant to the June 2018 Purchase Order. (Pl.'s Resp. to Def.'s SOF ¶ 5; *see generally* Complaint at Law ("Compl.") (Dkt. No. 1-1).) Omega removed Hunter's lawsuit to this Court based on diversity jurisdiction.[5] (Defendant's Notice of Removal (Dkt. No. 1) at 2.) After unsuccessfully moving to dismiss Hunter's claim based on lack of personal jurisdiction (see Dkt. Nos. 21, 28), Omega answered the Complaint and asserted seven affirmative defenses. (Def.'s Answer.)

Hunter provided its initial Rule 26(a)(1) disclosures in March 2021. (Pl.'s Resp. to Def.'s SOF ¶ 37.) In these disclosures, Hunter asserted $789,177.68 in damages. (*Id.*) Hunter's disclosures included a spreadsheet titled "Addendum A," which broke down Hunter's damages into three categories: (1) "FG & WIP COGS," which included packaging costs; (2) "Rework Costs"; and (3) "Failed Components Via Test and Related Costs," which included costs for

---

[5] We are satisfied that diversity jurisdiction over Hunter's lawsuit existed when it was removed. *See Grinnell Mut. Reinsurance Co. v. Shierk*, 121 F.3d 1114, 1117 (7th Cir. 1997) (diversity jurisdiction is determined at the time a state court case is removed to federal court). The amount in controversy exceeded $75,000. (Compl. ¶ 21 (alleging more than $750,000 in damages).) Moreover, the parties' citizenship is completely diverse. *See Page v. Democratic Nat'l Comm.*, 2 F.4th 630, 636 (7th Cir. 2021). Hunter is a citizen of Ohio (where it is incorporated) and Minnesota (where it maintains its principal place of business), and Omega is a citizen of California (where it is both incorporated and maintains its principal place of business). (Compl. ¶¶ 2–3; Pl.'s Resp. to Def.'s SOF ¶¶ 1, 3); *Page*, 2 F.4th at 635.

components Hunter purchased in transactions other than the one involving the June 2018

Purchase Order.  (*Id.* ¶¶ 50, 56–57; Addendum A to Plaintiff's Initial Rule 26(a)(1) Disclosures

("Addendum A") (Dkt. No. 78-17 at 5).)

Omega then issued document requests seeking (1) all documents substantiating Hunter's

damages claim, including but not limited to receipts, invoices, work orders, RMAs, or

timesheets; and (2) all documents relied upon by Hunter in preparing Addendum A.  (Pl.'s Resp.

to Def.'s SOF ¶¶ 39, 40.)  Omega also moved to compel Hunter to produce additional documents

to support its Rule 26(a)(1) damages disclosure, including "return invoices, RMAs, timesheets,

invoices for replacement parts and materials, income statements, balance sheets, or documents

showing Hunter had to make payments because of the damaged goods."  (*Id.* ¶ 41.)  After Hunter

purported to supplement its Rule 26(a)(1) disclosure with "all documents in accordance with

Rule 26," Omega withdrew its motion to compel.  (*Id.* ¶ 42.)  Later, in June, Hunter produced

1,576 pages of documents in response to Omega's requests.  (*Id.* ¶ 43.)  Hunter answered the

request seeking all documents substantiating its damages claim by stating that the documents had

been produced and would be supplemented with more documents.  (*Id.*)  It answered the request

seeking all documents relied upon in preparing Addendum A by stating that all documents other

than communications with counsel had been produced.  (*Id.*)

During a meet-and-confer at the end of June, Hunter agreed to review its documents,

confirm it had produced all documents it relied upon when preparing Addendum A, and produce

any additional documents by July 9.  (*Id.* ¶ 44.)  Hunter did not produce any additional damages-

related documents by this date, and "Omega relied upon Hunter's representation that it had

produced all responsive documents, including all documents used to prepare Addendum A," to

proceed with oral discovery.  (*Id.* ¶¶ 45–47.)  Despite this representation, Hunter produced 58

8

new pages of documents in December 2021 after the magistrate judge ordered it to identify all documents that supported Addendum A. (*Id.* ¶¶ 48–49.) Except for three non-party depositions that the parties contemplated taking, fact discovery closed on January 7, 2022. (Dkt. Nos. 55, 61.)

In December 2021, Hunter retained an accountant, Thomas Frazee, to examine its damages analysis and "determine if that analysis was supported by other records." (Transcript of Thomas Frazee's Deposition ("Frazee Dep.") (Dkt. No. 78-3) at 5:21–6:9, 28:2–7; Pl.'s Resp. to Def.'s SOF ¶ 58.) Hunter served Frazee's expert report on February 8, 2022. (*See* Expert Report of Thomas Frazee ("Frazee Report") (Dkt. No. 78-20).) Frazee's report states that he reviewed a damages calculation prepared by Hunter (the "Damages Summary"), which discloses four cost-based categories of damages:

1. the value of 2,269 finished or nearly finished End Products allegedly damaged by the MOSFETs (referred to as "Scrap Finished Goods & Work in Progress");

2. the cost to fix End Products that had not been fully assembled when the alleged defects in the MOSFETs were discovered (referred to as "Rework Costs");

3. the money Hunter paid Omega for components other than the MOSFETs (referred to as "Refund of Purchase Price"); and

4. the costs incurred evaluating whether the MOSFETs were defective (referred to as "Lab/Test Costs").

(*Id.* ¶¶ 1–2; *id.*, Ex. A ("Damages Summary") (Dkt. No. 78-20 at 8); Frazee Dep. at 59:12–20; Pl.'s Resp. to Def.'s SOF ¶ 65.) Added together, these categories total $756,905.19 in damages. (Damages Summary; Pl.'s Resp. to Def.'s SOF ¶ 64.) Hunter first disclosed the Damages Summary with Frazee's report. (Pl.'s Resp. to Def.'s SOF ¶ 64.)

Frazee accepted Hunter's calculations for Categories 2 and 4 without independently verifying them. (*Id.* ¶ 66; Frazee Report ¶ 1 & n.3.) And although Frazee reviewed the documents underlying Hunter's calculation for Category 3, he did not otherwise analyze this category of damages in his report. (Pl.'s Resp. to Def.'s SOF ¶ 66; Frazee Report ¶ 1 & n.2.) In short, Frazee's report does not provide any analysis for Categories 2, 3, and 4 of damages. (Pl.'s Resp. to Def.'s SOF ¶ 66.)

Frazee's report, however, discusses two alternative methods for calculating Hunter's Category 1 damages. (*Id.* ¶¶ 66–67; Frazee Report ¶ 3.) Using the first method, Frazee calculated the value of the "scrapped" End Products based on the prices Hunter's customer was willing to pay for the products.[6] (Frazee Report ¶¶ 3, 16.) Frazee looked to Hunter's "quote models"—spreadsheets Hunter uses "to estimate its cost to manufacture the product and to provide a price quotation to its customer"—to determine these prices. (*Id.* ¶ 5; Pl.'s Resp. to Def.'s SOF ¶ 68.) Then, to verify these prices, Frazee reviewed a sales summary report for the End Products and "[a] December 2018 invoice sent to Hunter's customer for each End Product." (Frazee Report ¶ 4 & n.4; Pl.'s Resp. to Def.'s SOF ¶ 59.) The first method results in a value of $629,895. (Frazee Report ¶ 3.)

The second method calculated how much it cost Hunter to remake the End Products that were damaged by the MOSFETs based on four categories of costs: materials, direct labor, overhead, and packaging. (Pl.'s Resp. to Def.'s SOF ¶ 67; Damages Summary.) Hunter calculated this amount to be $606,383.28. (Frazee Report ¶¶ 2–3; Damages Summary.)

---

[6] The parties assert that this method of calculation also "deducted Hunter's alleged cost to make the" End Products (Pl.'s Resp. to Def.'s SOF ¶ 67 (citing Frazee Report ¶¶ 3–4)), but paragraphs 3 and 4 of Frazee's report do not discuss such a deduction.

Frazee analyzed the second method of calculation at two different levels. First, he compared the costs calculated for materials, direct labor, and overhead in the Damages Summary to information contained in Hunter's quote models. (Pl.'s Resp. to Def.'s SOF ¶ 68; Frazee Report ¶¶ 5, 7, 10, 14–15, 17–18, & Ex. C.) Second, he compared the information contained in the quote models to other documents that showed Hunter's actual costs for raw materials, direct labor, and overhead. (Pl.'s Resp. to Def.'s SOF ¶ 68; Frazee Report ¶¶ 4–5, 8–9, 11, 13, 15, 17–18, & Exs. D1 to D2.) We discuss Frazee's analysis for each of these cost categories in more detail below.

*Materials.* Frazee found that the raw material costs set forth in the quote models approximated the material costs listed in the Damages Summary. (Frazee Report ¶ 10.) Frazee also found that the raw material costs set forth in the quote models were consistent with the actual purchase prices for the raw materials. (*Id.* ¶¶ 5(a), 9(d).) To determine the actual purchase prices for the raw materials, Frazee reviewed purchase orders for subcomponents that make up more than 80 percent of Hunter's raw material costs for the End Products. (*Id.* ¶ 9.)

*Direct Labor.* The estimated cost of direct labor "is a function of the hourly rates for the plant's direct labor personnel[] and the estimated number of necessary labor hours to make each piece." (*Id.* ¶ 5(b).) Frazee found that the hourly rate used in the quote models (approximately $16 per hour) was consistent with the facility's plant-wide labor rate for the second half of 2018 (approximately $17 per hour). (*Id.* ¶ 13.) The latter rate was based on a monthly operating report provided by Hunter. (*Id.* ¶ 13 n.9.) Frazee then calculated the "implied" number of direct labor hours used in the Damages Summary for the End Products by dividing the direct labor cost listed in the Damages Summary for each product by the $16 hourly rate used in the quote models. (*Id.* ¶ 14; Frazee Dep. at 119:25–120:12.) Frazee opined that the difference between the

implied direct labor hours for the Trial Simulator based on the Damages Summary (1.65 hours) and the direct labor hours listed in the quote models (1.5 hours) was "not large enough to suggest any inaccuracy with the Damage[s] Summary." (Frazee Report ¶ 14(a)(i).) However, the difference between the implied direct labor hours for the Charger based on the Damages Summary (2.1 hours) and the direct labor hours listed in the quote models (1.0 hour) was "more significant." (*Id.* ¶ 14(a)(ii).) To the extent the Damages Summary overstated Hunter's number of direct labor hours for the Charger, Frazee continued, the maximum reduction to the damages claimed by Hunter in the Damages Summary would be $112,237. (*Id.*)

***Overhead.*** To calculate overhead costs in the Damages Summary, Hunter applied an overhead "factor" amounting to 210 percent of the direct labor costs. (*Id.* ¶ 5(c)(i).) Frazee concluded that the overhead factors used in the quote models (215 percent for the Charger and 212 percent for the Trial Simulator) supported the reasonableness of this factor. (*Id.* ¶¶ 5(c)(ii), 15.) Frazee also concluded that the 210 percent overhead factor was reasonable based on his own calculation of an overhead factor, which amounted to 238 percent. (*Id.* ¶ 15.) Frazee based this calculation on a file that listed various monthly costs at Hunter's facility from July 2018 to June 2020. (*Id.*)

In sum, Frazee concluded that the costs calculated in the Damages Summary were reasonably consistent with, although not equal to, the cost estimations set forth in Hunter's quote models, with one exception: the costs for direct labor on the Charger product. (*Id.* ¶¶ 17–18.) If the number of labor hours listed for the Charger in the quote models was used instead of the number of labor hours implicitly used in the Damages Summary, Hunter's damages total would decrease by $112,237. (*Id.* ¶¶ 14, 17(a).) Frazee also determined that the quote models' estimations for raw material costs, direct labor hourly rate, and the overhead factor were

supported by subcomponent purchase orders and Hunter's monthly facility-level operating statements.  (*Id.* ¶¶ 17–18.)

Frazee based portions of his opinion on documents that Hunter did not produce during fact discovery.  In particular, Frazee relied upon (1) a sales summary report "for the products that contained the allegedly defective" MOSFETs and "[a] December 2018 invoice sent to Hunter's customer for each End Product" to verify the selling price of the End Products as part of calculating the value of the scrapped End Products; (2) "[p]urchase orders for subcomponents other than the [MOSFETs] assembled into the End Products" to determine the actual purchase prices for Hunter's raw materials; (3) a monthly operating report to determine the reasonableness of the labor hourly rate used in the quote models; and (4) a file showing Hunter's monthly facility costs from July 2018 to June 2020 to test the reasonableness of the overhead factor used by Hunter in the Damages Summary.  (*Id.* ¶¶ 4, 9, 13, 15(a), & nn.4, 9; Pl.'s Resp. to Def.'s SOF ¶ 59.)  Although Omega requested these documents during fact discovery, Hunter did not produce them until February 25, 2022.  (Pl.'s Resp. to Def.'s SOF ¶¶ 59, 61.)  In contrast, Hunter provided these documents to Frazee within a week after he requested them.  (*Id.* ¶ 61.)

Frazee also spoke with Somi Jalal, a member of Hunter's accounting and finance team, to prepare his report.  (*Id.* ¶ 62; Frazee Report ¶ 19.)  Frazee did so because Jalal "was the person who was most familiar with Hunter's financial records and [] could provide information that Hunter's Rule 30(b)(6) witness on damages . . . did not have."  (Pl.'s Resp. to Def.'s SOF ¶ 63.)  Jalal provided Frazee with additional back-up information related to purchase orders and information that was outstanding on overhead and direct labor costs.  (*Id.*)  Hunter did not disclose Jalal in its Rule 26(a)(1) disclosures.  (*Id.* ¶ 62.)

Omega deposed Frazee on February 28, 2022. (*See* Frazee Dep. at 3:2–13.) On April 14, Omega served an expert report on damages from Timothy Voncina. (*See generally* Expert Report of Timothy J. Voncina CPA, CMA, CGMA, CFF, CFE (Dkt. No. 98-1).) In his report, Voncina opines that Hunter's economic damages are $503,648. (*Id.* at 7.)

## ANALYSIS

As we noted at the outset of this opinion, three motions are pending before us: (1) Omega's motion to exclude; (2) Omega's motion for summary judgment; and (3) Hunter's motion for summary judgment on liability. We start with Omega's motion to exclude. We then address its summary judgment motion before proceeding to Hunter's summary judgment motion.

## I.      Omega's Motion to Exclude

Omega's motion to exclude invokes both the Federal Rules of Civil Procedure and the Federal Rules of Evidence. Relying upon Federal Rule of Civil Procedure 37, Omega seeks to preclude Hunter and its damages expert from relying upon certain damages-related documents and information. (Mem. to Exclude at 10–12.) Omega also seeks to exclude Frazee's expert opinions under Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). (*Id.* at 9–10, 13–15.)

### A.      Federal Rule of Civil Procedure 37

Under Federal Rule of Civil Procedure 37, a party that "fails to provide information or identify a witness as required by Rule 26(a) or (e) . . . is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). To address Omega's argument based on Rule 37, we must first determine whether Hunter violated Rule 26(a) or (e). If so, we then ask whether the violation was substantially justified or harmless.

### 1.     Requested Documents

We start with Hunter's failure to produce certain damages-related documents before the close of fact discovery.  In providing his expert opinion, Frazee relied upon the following documents that Omega requested during discovery: (1) a sales summary report "for the products that contained the allegedly defective" MOSFETs; (2) "[a] December 2018 invoice sent to Hunter's customer for each End Product"; (3) "[p]urchase orders for subcomponents other than the [MOSFETs] assembled into the End Products"; (4) "the monthly operating report Hunter used to determine hourly employee wages"; and (5) "[a] file provided by Hunter that identified its facility's costs by month from July 2018 to June 2020" (hereinafter, the "Requested Documents").  (Frazee Report ¶¶ 4, 9, 13, 15(a) & nn.4, 9; Pl.'s Resp. to Def.'s SOF ¶ 59.) Hunter did not provide these documents to Omega until February 25, 2022—seven weeks after fact discovery closed in relevant part,[7] and the Friday before Frazee's deposition was to take place the following Monday, February 28.  (*See* Pl.'s Resp. to Def.'s SOF ¶¶ 59, 61; Frazee Dep. at 3:2–13.)

Hunter's failure to produce the Requested Documents during fact discovery violated Rules 26(a) and (e).  "[W]ithout awaiting a discovery request," Hunter was required to produce (1) all documents in its possession that it "may use to support its claims . . . unless the use would be solely for impeachment"; and (2) "the documents or other evidentiary material" on which its damages computations are based. Fed. R. Civ. P. 26(a)(1)(A)(ii)–(iii).  Hunter also had to timely supplement these document productions, as well as any production made necessary by Omega's document requests, if it learned that the productions were incomplete in some material respect

---

[7] The parties contemplated taking three non-party depositions after the January 7, 2022 fact discovery cut-off (Dkt. Nos. 55, 61), but this did not affect Hunter's obligations to produce the Requested Documents by January 7.

and the additional documents had not otherwise been made known to Omega.  Fed. R. Civ. P. 26(e)(1)(A).  Hunter does not dispute that Rule 26(a)(1)(A) required it to produce the Requested Documents.  (Memorandum of Law in Opposition to Defendant's Motion to Exclude ("Opp'n to Mot. to Exclude") (Dkt. No. 95) at 13–14.)  Hunter's failure to produce the Requested Documents during fact discovery thus violated this rule, as well as Hunter's duty to supplement under Rule 26(e)(1)(A).  Hunter's failure to produce the Requested Documents in response to Omega's document requests likewise violated Rule 26(e)(1)(A).  *See, e.g.*, *Simon Prop. Grp., L.P. v. mySimon, Inc.*, No. IP 99-1195-C H/S, 2003 WL 1807135, at *14 (S.D. Ind. Mar. 26, 2003) (party's failure to produce relevant documents before trial violated its obligation to supplement its discovery responses under Rule 26(e)).

Hunter nonetheless contends that it did not violate Rule 26(a) because it did not know that the Requested Documents were relevant to its damages computation until Frazee requested them.  (Opp'n to Mot. to Exclude at 14.)  This contention is not well-taken.  Omega requested the documents during fact discovery (Pl.'s Resp. to Def.'s SOF ¶ 59), and Hunter does not contend that it objected to these document requests on relevance grounds.  Moreover, Hunter should have understood the relevance of the Requested Documents based on the damages it claimed in Addendum A, which it produced at the beginning of discovery.  (*See id.* ¶¶ 37–38.)  For instance, Addendum A calculates damages based on inputs such as direct labor ("DL") costs, overhead ("OH") costs, and information derived from purchase orders for subcomponents (e.g., unit price, quantity ordered, and quantity received).  (Addendum A.)  We do not see how Hunter failed to realize that documents showing employee wages and facility costs are relevant to its calculation of direct labor and overhead costs, or that purchase orders for subcomponents are relevant to information derived from those purchase orders.  To the contrary, given the number

16

of times Hunter reviewed (or should have reviewed) its documents to ensure that it had produced all documents supporting its damages claim—after Omega filed its motion to compel, after the parties' June 2021 meet-and-confer, and after the magistrate judge's order for Hunter to produce all documents supporting Addendum A (Pl.'s Resp. to Def.'s SOF ¶¶ 41–42, 44, 47–48)—we find it implausible that Hunter did not know that it should produce the Requested Documents during fact discovery.

At any rate, even if we accept Hunter's assertion that it was unaware of the Requested Documents' relevance until Frazee asked for them, Hunter still violated Rule 26(e) by failing to produce the documents "in a timely manner." Fed. R. Civ. P. 26(e)(1)(A). Timely producing information under Rule 26(e) means doing so "without undue delay upon discovering the information that is to be provided." *Fair Isaac Corp. v. Fed. Ins. Co.*, 337 F.R.D. 413, 419 (D. Minn. 2021). Hunter knew about Frazee's reliance upon the Requested Documents by, at the very latest, February 8, 2022, when it served Frazee's expert report. Yet Hunter did not produce the documents until February 25—more than two weeks later. Such a delay by itself may not be untimely in many circumstances, but here it resulted in the production of the Requested Documents on the last business day before Frazee was to be deposed. We see no reason for this delay other than to improperly deprive Omega of the ability to review the documents to prepare for Frazee's deposition until the (almost) very last minute. *See Data Mgmt. Ass'n Int'l, LLC v. Enter. Warehousing Sols., Inc.*, No. 20 C 4711, 2022 WL 17541219, at *3 (N.D. Ill. Mar. 16, 2022) ("Supplementing discovery responses must be done 'timely,' and not delayed to create tactical advantage."); *see also Fair Isaac Corp.*, 337 F.R.D. at 419 ("[E]ven a supplementation prior to the close of discovery may be untimely where the producing party withheld information only to produce it at a time calculated to gain a tactical advantage.").

17

Because Hunter violated Rules 26(a) and (e), exclusion of the Requested Documents is automatic and mandatory unless Hunter shows that the violation was either substantially justified or harmless. Fed. R. Civ. P. 37(c)(1); *Karum Holdings LLC v. Lowe's Cos.*, 895 F.3d 944, 951 (7th Cir. 2018); *Salgado ex rel. Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998). Hunter first argues that its violation was justified because it did not know that the Requested Documents were relevant until Frazee asked for them, comparing its violation to the plaintiff's failure to produce its CEO's personal tax returns in *LiiON, LLC v. Vertiv Group Corp.*, No. 18 CV 6133, 2020 WL 6894668 (N.D. Ill. Nov. 24, 2020). (Opp'n to Mot. to Exclude at 15–16.) In *LiiOn*, the defendants requested the CEO's personal tax returns during fact discovery, but the plaintiff objected based on a lack of relevance and did not produce the returns. 2020 WL 6894668, at *4–5. Later, the plaintiff's damages expert relied extensively on the tax returns in his report. *Id.* The magistrate judge found that the plaintiff's failure to produce the tax returns during fact discovery was substantially justified because the plaintiff timely objected to producing these documents on relevance grounds, the plaintiff had no reason to anticipate that the returns "would be relevant to its damages model," and it was only upon its expert's review of the returns that the plaintiff discovered the relevance of the documents. *Id.* at *5.

*LiiON* does not help Hunter. Unlike the plaintiff in *LiiON*, Hunter did not timely object to producing the Requested Documents on relevance grounds. Instead, Hunter responded to Omega's document requests by representing that it had produced, or would produce, all documents substantiating its alleged damages. (Pl.'s Resp. to Def.'s SOF ¶¶ 43–44, 47.) Moreover, whereas the plaintiff in *LiiON* may not have had a reason to anticipate the relevance of its CEO's personal tax returns, Hunter should have realized the relevance of the Requested

Documents well before Frazee requested them, as already discussed.  For these reasons, Hunter has not shown that its violation was substantially justified.

We therefore must determine whether Hunter's failure to produce the Requested Documents earlier was harmless.  To determine whether a party's non-compliance with Rule 26(a) or (e) is harmless, we consider the following factors: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Tribble v. Evangelides*, 670 F.3d 753, 760 (7th Cir. 2012) (quoting *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003)).

The first factor favors exclusion.  Although Omega's damages expert had ample time (nearly seven weeks) to review the Requested Documents before providing his expert report, Hunter's late production of the Requested Documents deprived Omega of "the opportunity to investigate the source of the documents, the circumstances of their creation, the [individuals] most knowledgeable about them, or their accuracy" by propounding discovery requests or deposing fact witnesses, such as Hunter's Rule 30(b)(6) witness on damages.  (Mem. to Exclude at 12; Defendant's Reply in Support of Its Motion to Exclude ("Reply to Mot. to Exclude") (Dkt. No. 98) at 8); *see LiiON*, 2020 WL 6894668, at *2 (striking portions of expert report that relied upon documents the plaintiff produced on the last day of discovery where the defendants "did not have an opportunity to question the witnesses about the financial information reflected" in the documents).  The late production also gave Omega's counsel only one weekend to review the documents and prepare deposition questions for Frazee based on the documents.  Thus, Omega was prejudiced.

The second factor also supports exclusion.  To be sure, Omega could have alleviated some of the prejudice with respect to its ability to question Frazee about his reliance on the Requested Documents if it had accepted Hunter's offer to produce Frazee for a second deposition.  (*See* Opp'n to Mot. to Exclude at 16; Reply to Mot. to Exclude at 8.)  That said, there is no indication that Frazee would have been able to testify about "the source of the documents, the circumstances of their creation, . . . or their accuracy."  (Reply to Mot. to Exclude at 8.)  Omega can obtain this information only if we reopen fact discovery and allow Omega to serve more discovery requests and depose more witnesses.  This is not an adequate cure at this stage of the litigation, where fact discovery has been closed for more than a year and the parties have already filed their motions for summary judgment.  *See Karum Holdings LLC v. Lowe's Cos.*, No. 15 C 380, 2017 WL 10311207, at *1–2, *5 (N.D. Ill. Sept. 8, 2017) (requiring the defendants to seek leave to reopen fact discovery after summary judgment had been decided and discovery had "been closed for well over a year" would not cure the prejudice caused by the plaintiffs' Rule 26(a) violation), *aff'd*, 895 F.3d 944 (7th Cir. 2018); *see also DR Distribs., LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 960 (N.D. Ill. 2021) ("The ability of the district court to reopen discovery after its closure does not make a party's action substantially justified or harmless.").

The third factor weighs against exclusion.  We have not yet set a trial date, so allowing Hunter to cure its Rule 26 violation would not disrupt the trial in this case.

The fourth and final factor weighs in favor of exclusion.  As already discussed, Hunter's assertion that it did not know that the Requested Documents were relevant until Frazee requested them is not convincing.  What is more, Hunter provides no explanation for waiting more than two weeks after serving Frazee's expert report—and until the last business day before Frazee's

20

deposition—to produce the documents.  Although we are not prepared to say that Hunter acted in bad faith, its conduct was at least willful.  *See RTC Indus., Inc. v. Fasteners for Retail, Inc.*, No. 17 CV 3595, 2020 WL 4815948, at *7 (N.D. Ill. Aug. 19, 2020) (finding that the plaintiff's failure to timely disclose information that it knew or should have known since the beginning of the case was willful); *see also Lujano v. Town of Cicero*, No. 07 C 4822, 2011 WL 6822204, at *4 (N.D. Ill. Dec. 23, 2011) (finding that the plaintiff's failure to produce information earlier was willful when she failed to give any reasoned explanation for the failure).

On balance, the applicable factors show that Hunter's late disclosure of the Requested Documents was not harmless.  Because Hunter has not shown that its Rule 26 violation with respect to these documents was substantially justified or harmless, we preclude Hunter and any witness, including Frazee, from relying upon them at trial.

### 2. Somi Jalal

That brings us to Hunter's failure to disclose Somi Jalal during fact discovery.  Jalal, a member of Hunter's accounting and finance team, provided Frazee with additional back-up information related to purchase orders and information that was outstanding on overhead and direct labor costs.  (Pl.'s Resp. to Def.'s SOF ¶¶ 62, 63.)  Frazee spoke with Jalal because she was the person who was most familiar with Hunter's financial records and could provide information that Hunter's Rule 30(b)(6) witness on damages did not have.  (*Id.* ¶ 63.)  Hunter, however, did not identify Jalal in its Rule 26(a)(1) disclosures.  (*Id.* ¶ 62.)  It appears that she was first disclosed on February 8, 2022, when Hunter served Frazee's expert report.  (*See* Frazee Report ¶ 19 (identifying Jalal as an individual with whom Frazee had spoken).)

We first consider whether Hunter's failure to identify Jalal earlier in the litigation violated Rule 26.  Rule 26(a)(1) requires a party to disclose at the outset of a case the name of every "individual likely to have discoverable information—along with the subjects of that

information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(i). A party must supplement these initial disclosures under Rule 26(e)(1), and this duty continues even after fact discovery closes. *Fair Isaac Corp.*, 337 F.R.D. at 419; *Munive v. Town of Cicero*, No. 12 C 5481, 2016 WL 8673072, at *7 (N.D. Ill. Oct. 14, 2016).

Hunter's disclosure of Jalal did not comply with Rule 26. At least as of January 2022, Jalal was the person "most familiar with Hunter's financial records and [] could provide information" that Hunter's Rule 30(b)(6) representative on damages could not. (Pl.'s Resp. to Def.'s SOF ¶¶ 51, 63; Frazee Dep. at 50:10–51:17.) Jalal also provided Frazee with information related to purchase orders and overhead and direct labor costs—information that is directly relevant to Hunter's damages claim. (Pl.'s Resp. to Def.'s SOF ¶¶ 63–64; Addendum A; Damages Summary.) Thus, Jalal is an individual who is "likely to have discoverable information" upon which Hunter may rely. Fed. R. Civ. P. 26(a)(1)(A)(i).

Yet there is no indication that Hunter supplemented its initial disclosures to identify Jalal and the subjects of discoverable information that she is likely to know about. *See* Fed. R. Civ. P. 26(a)(1)(A)(i), 26(e)(1)(A). Nor does Frazee's identification of Jalal in his expert report excuse Hunter's failure to supplement, as the report does not disclose the subjects of discoverable information that Jalal is likely to know about. (*See* Frazee Report ¶ 19.) Accordingly, Hunter's disclosure of Jalal violated Rules 26(a) and (e).

Arguing otherwise, Hunter contends that it did not violate its initial disclosure obligations because Jalal is not a fact witness in this case. (Opp'n to Mot. to Exclude at 14.) We disagree. When Rule 26 requires a party to identify witnesses, it expressly says so. *See* Fed. R. Civ. P. 26(a)(3)(A)(i) (requiring a party to disclose every expected "witness" as part of its pretrial

disclosures).  And the obligation imposed by Rule 26(a)(1) is not limited to the identification of *witnesses*; it requires a party to identify all individuals "likely to have discoverable information" that the party may rely upon.  Fed. R. Civ. P. 26(a)(1)(A)(i).  Whether Hunter expects Jalal to be a witness in this case does not affect its obligation to disclose her under Rules 26(a)(1)(A)(i) and 26(e)(1)(A).

Hunter further asserts that Jalal "was not likely to have discoverable information" because she did not join the company until May 2021 and did not begin working in an accounting role until after the close of fact discovery.  (Opp'n to Mot. to Exclude at 8, 14.)  Hunter does not support this assertion with any evidence, so we need not consider it.  *See, e.g.*, *Mitze v. Colvin*, 782 F.3d 879, 882 (7th Cir. 2015) ("[A]ssertions in briefs are not evidence[.]"); *In re Morris Paint & Varnish Co.*, 773 F.2d 130, 134 (7th Cir. 1985) ("[F]actual assertions made by counsel in a brief, unsupported by affidavits, cannot be given any weight.").  But even if Jalal did not have discoverable information when she first joined Hunter, she had obtained discoverable information by the time she spoke with Frazee in January 2022.  (*See* Pl.'s Resp. to Def.'s SOF ¶ 63; Frazee Dep. at 50:10–51:17.)  Thus, by this time, Hunter was obligated to supplement its initial disclosures to identify Jalal and the subjects of her knowledge.  It did not do so.

As a result, we must preclude Hunter and Frazee from relying upon information provided by Jalal unless Hunter shows that its non-compliance was substantially justified or harmless.  Fed. R. Civ. P. 37(c)(1); *Karum Holdings*, 895 F.3d at 951; *Salgado*, 150 F.3d at 742.  Hunter has not made either showing.  Hunter merely asserts in a footnote that its disclosure of Jalal's "role during expert discovery was entirely harmless and justified" for the same reasons that it did not violate Rule 26(a).  (Opp'n to Mot. to Exclude at 14 & n.3.)  This perfunctory and

undeveloped argument falls well short of demonstrating that Hunter's failure to properly disclose Jalal was either substantially justified or harmless. *See Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority."); *Pietrzycki v. Heights Tower Serv., Inc.*, 290 F. Supp. 3d 822, 842–43 (N.D. Ill. 2017) (finding that the defendants' "undeveloped and unsupported argument" was not sufficient to satisfy their burden of proof). Accordingly, we also preclude Hunter and Frazee from relying upon information provided by Jalal.

### B. Federal Rule of Evidence 702 and *Daubert*

Federal Rule of Evidence 702 and *Daubert* govern the admissibility of expert testimony. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 778 (7th Cir. 2017). "Expert testimony is admissible when: (1) 'the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue'; (2) 'the testimony is based on sufficient facts or data'; (3) 'the testimony is the product of reliable principles and methods'; and (4) 'the expert has reliably applied the principles and methods to the facts of the case.'" *Downing v. Abbott Laboratories*, 48 F.4th 793, 808–09 (7th Cir. 2022) (quoting Fed. R. Evid. 702), *reh'g denied*, 2022 WL 7291035 (7th Cir. Oct. 12, 2022), *cert. denied*, 143 S. Ct. 1012 (U.S. Mar. 6, 2023). Under Rule 702 and *Daubert*, "the district court acts as the gatekeeper for expert evidence, evaluating the proffered expert's qualifications, the reliability of the expert's methodology, and the relevance of the expert's testimony." *Id.* at 809 (internal citation omitted). "The party seeking to introduce expert witness testimony has the burden to show, by a preponderance of the evidence, that the testimony meets the *Daubert* standard." *Id.* Nonetheless, "rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

Omega challenges the admissibility of Frazee's expert testimony on several grounds, but Frazee's qualifications to testify as a damages expert is not one of them. We therefore do not consider the qualifications prong of the *Daubert* inquiry, nor do we consider any other *Daubert*-related argument that Omega does not raise. *See United States v. Jett*, 908 F.3d 252, 266 (7th Cir. 2018) ("District judges are not required to undertake each step of the Rule 702 analysis when no party specifically requests it[.]").

### 1. Categories 2, 3, and 4 of Damages

Omega first contends that we should bar Frazee from testifying about three categories of damages—Category 2 (Rework Costs), Category 3 (Refund of Purchase Price), and Category 4 (Lab/Test Costs)—because he did not form an expert opinion about any of these categories. (Mem. to Exclude at 9.) Hunter concedes that Frazee did not opine about Categories 3 and 4, but it asserts, without citing any evidence, that Frazee verified key inputs for Category 2, such as the labor rate, as part of his work on Category 1. (Opp'n to Mot. to Exclude at 10–11.)

We preclude Frazee from testifying about Categories 2, 3, and 4 of damages. In view of Hunter's concession that Frazee did not opine about Categories 3 and 4, there is no basis for him to testify about these categories. Nor is there a basis for him to testify about Category 2. Nothing in Frazee's report suggests that he verified the labor rate (or any other input) for Hunter's Category 2 calculation as part of his work on Category 1. And even if Frazee had done so, he still did not give an expert opinion about Category 2. (*See* Pl.'s Resp. to Def.'s SOF ¶ 66 (admitting that Frazee "analyzed Hunter's alleged category one damages only").) Instead, he simply accepted Hunter's calculation for Category 2 without substantively verifying it. (*Id.*; Frazee Report ¶ 1 n.3.) Because Frazee has not provided an expert opinion for Categories 2, 3, or 4, he cannot testify about these categories of damages. *See Burns v. Sherwin-Williams Co.*, No. 19-cv-5258, 2022 WL 4329417, at *20 (N.D. Ill. Sept. 18, 2022) ("An expert witness is not

a fact witness, and an expert witness is not a mouthpiece for telling the jury facts by calling them 'opinions.'"); *see also United States v. York*, 572 F.3d 415, 425 (7th Cir. 2009) (noting that when an expert gives factual testimony, "the jury might be smitten by [the] expert's 'aura of special reliability' and therefore give his factual testimony undue weight" (quoting *United States v. Brown*, 7 F.3d 648, 655 (7th Cir. 1993))).

### 2. Category 1 of Damages – First Method of Calculation

Omega next contends that we should preclude Frazee from testifying about the first method of calculating Category 1 damages. (Mem. to Exclude at 10.) This method calculates the value of the scrapped End Products based on the prices that Hunter's customer was willing to pay for the products. (Frazee Report ¶¶ 3–4, 16.) Omega says this calculation method relies upon Hunter's failure to sell the End Products affected by the MOSFETs, which does not fit the facts of the case because Hunter sold these products after it reworked them. (Mem. to Exclude at 10; Reply to Mot. to Exclude at 3–4.) According to Hunter, though, it did not rework and sell the affected End Products; it scrapped them. (Opp'n to Mot. to Exclude at 12.)

The parties do not cite anything from the record to support their respective assertions. (*See* Mem. to Exclude at 10; Opp'n to Mot. to Exclude at 12; Reply to Mot. to Exclude at 3–4.) Faced with the parties' competing and unsupported assertions regarding whether Hunter reworked and sold the End Products, we decline to preclude Frazee from testifying about this method of calculation based on a lack of factual "fit."

### 3. Category 1 of Damages – Second Method of Calculation

Omega also argues that we should preclude Frazee from testifying about the second method of calculating Category 1 damages, which is based on the cost of remaking the End Products that were damaged by the MOSFETs. (Mem. to Exclude at 13–15; Pl.'s Resp. to Def.'s SOF ¶ 67.) This argument has several components.

Omega first argues that because Frazee asked for the Requested Documents and information from Jalal, it is implicit "that he could not have formed his opinions without them." (Mem. to Exclude at 13.)  Therefore, Omega continues, our exclusion of this evidence means that Frazee "does not have sufficient facts and data to support his opinions."  (*Id.* at 13 (citing Fed. R. Evid. 702(b)).)  Hunter counters by contending that Frazee's expert opinion is adequately supported even if we exclude the Requested Documents and information from Jalal.  (Opp'n to Mot. to Exclude at 17.)  Hunter contends that Frazee relied on spreadsheets that were produced during discovery and that he only requested the now-excluded documents and information as a "means to confirm information he obtained from" the spreadsheets.  (*Id.*)

Omega's argument is not persuasive.  The mere fact that Frazee requested information that we have excluded does not mean that every aspect of his opinion relies upon this information.  Although our exclusion of evidence under Rule 37 leaves some portions of Frazee's expert opinion about Category 1 damages without factual support, it does not render the entirety of this opinion factually unsupported.  Frazee analyzed the second method of calculating Category 1 damages at two levels, with the first level involving a comparison of amounts calculated in the Damages Summary to information contained in Hunter's quote models.  (Pl.'s Resp. to Def.'s SOF ¶ 68; Frazee Report ¶¶ 5, 7, 10, 14–15, 17–18, & Ex. C.)  These quote models, which Omega appears to have produced during discovery,[8] are independent of the evidence we have excluded and provide a factual basis for this aspect of Frazee's expert opinion.

In its reply, Omega argues for the first time that Hunter's "damages spreadsheets" are inadmissible under (1) Federal Rules of Evidence 703 and 1006 because they are based on the

---

[8] The quote models bear Bates numbers OMEGA_001489, OMEGA_001490, and OMEGA_001491.  (Frazee Report ¶ 5.)

evidence we have excluded, and (2) Federal Rule of Evidence 403 because the prejudicial effect of the spreadsheets outweighs their probative value.  (Reply to Mot. to Exclude at 9–10.)  But Omega should made these arguments in its opening memorandum.  By failing to do so, Omega forfeited these arguments for purposes of its motion to exclude.  *See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) (a district court may "find that an argument raised for the first time in a reply brief is forfeited").

Omega also contends that Frazee's opinion lacks sufficient supporting facts and data because he (1) "did not review any source documents for 20% of the raw materials Hunter used in the End Products"; (2) "cannot say how much Hunter actually paid for the raw materials"; and (3) "does not know how many man-hours it took to make each individual End Product."  (Mem. to Exclude at 13–14; *see* Pl.'s Resp. to Def.'s SOF ¶¶ 69–70 (admitting similar facts).)  In response, Hunter argues that these criticisms "do not go to admissibility but to the appropriate weight that should be accorded to the evidence."  (Opp'n to Mot. to Exclude at 19 (quotation marks omitted).)

Omega's criticisms are moot to the extent they are directed to aspects of Frazee's opinion that we have already excluded.  To the extent these criticisms address non-excluded aspects of Frazee's opinion, however, we agree with Hunter.  Rule 702(b) only requires an expert's opinion to be supported by "*sufficient* facts or data."  Fed. R. Evid. 702(b) (emphasis added); *see also Lawes v. CSA Architects & Eng'rs LLP*, 963 F.3d 72, 101 (1st Cir. 2020) (explaining that Rule 702 does not require an expert to "rely on all data that could be deemed relevant" or even to "seek out the best possible source of relevant information").  Although Frazee's failure to consider certain information may provide fodder for cross-examination, it does not render his opinion inadmissible, as it is for the jury to evaluate the "soundness" of the facts and data

underlying the opinion. *See Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1068 (7th Cir. 2013); *Ernst v. City of Chicago*, 39 F. Supp. 3d 1005, 1014 (N.D. Ill. 2014); *see also Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) ("The district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed.").

Omega next argues that Frazee's opinions will confuse the jury because Frazee "did not actually calculate Hunter's damages"; "[i]nstead, he compared some documents to Hunter's own (revised) summary of its damages and attempted to give the summary a rubber stamp." (Mem. to Exclude at 14.) Omega contends that "[t]his nuanced difference between Frazee's opinions and those of the typical retained experts who form their own opinions about the plaintiff's damages make his opinions 'especially prone to misinterpretation.'" (*Id.* (quoting *Kleen Prods. LLC v. Int'l Paper*, No. 10 C 5711, 2017 WL 2362567, at *12 (N.D. Ill. May 31, 2017)).)

*Kleen Products* does not help Omega's argument. *Kleen Products* was an antitrust class action where the plaintiffs, direct purchasers of products from the defendants, accused the defendants of conspiring to fix prices. 2017 WL 2362567, at *1. The plaintiffs' experts opined that because the defendants' conduct was consistent with collusion, the defendants "likely engaged in an illegal conspiracy." *Id.* at *12. The court found that these opinions, which sometimes did not specify whether the collusion was express or tacit, were "prone to misinterpretation" because they could erroneously suggest to the jury that tacit collusion violates antitrust law, even though it does not. *Id.* Contrary to Omega's assertion, the *Kleen Products* court was not concerned with the fact that the plaintiffs' experts were opining that the defendants' conduct was merely "consistent" with illegal conduct; it was concerned with confusion that might arise from the experts' use of imprecise language in giving these opinions.

Omega does not direct us to any caselaw suggesting that the testimony of an expert who evaluates the reasonableness of his party's damages calculation—as opposed to giving his own assessment of the party's damages—fails to help the jury "understand the evidence or [] determine a fact in issue[.]" Fed. R. Evid. 702(a); *see also Freesen, Inc. v. Boart Longyear Co.*, No. 07-3318, 2009 WL 4923598, at *3–4 (C.D. Ill. Dec. 8, 2009) (finding that expert testimony that "mathematically tested [damages] calculations prepared by" the plaintiff to determine if they were reasonable and consistent with industry practices would assist the jury in analyzing the plaintiff's damages). Frazee's expert opinion on the reasonableness of Hunter's damages calculation (to the extent we have not excluded the opinion) may help the jury determine what amount of damages to award if Hunter establishes liability. We are also confident that both parties' attorneys will ensure that the jury knows precisely what Frazee is (and is not) opining about through their questioning of him at trial.

Finally, Omega contends that "Frazee's opinions are premised on inadmissible *ipse dixit* reasoning." (Mem. to Exclude at 14.) According to Omega, Frazee "cannot link his conclusions to the factual record," nor can he "exclude the possibility that Hunter's actual damages are different from what Hunter has proffered because he has not reviewed sufficient facts and data to make that determination." (*Id.*)

A court should exclude an expert opinion that is connected to the existing data only by the expert's *ipse dixit*, which occurs when "there is simply too great an analytical gap between the data and the opinion proffered." *United States v. Owens*, 18 F.4th 928, 941 n.5 (7th Cir. 2021) (quotation marks omitted). But there is no analytical gap with respect to the portions of Frazee's opinion that we have not excluded. Frazee relied upon quote models produced during discovery to make calculations and evaluations related to both methods of calculating Category 1

damages.  Although Omega apparently takes issue with Frazee's conclusion that the differences

between the figures in the quote models and the Damages Summary are reasonable, whether

these differences are reasonable is a matter for the jury to decide.  *See, e.g.*, *Gopalratnam*, 877

F.3d at 781.  We also do not see why Frazee is required to "exclude the possibility that Hunter's

actual damages are different from what Hunter has proffered" (Mem. to Exclude at 14), given

that Hunter need only prove its contract damages with reasonable, not absolute, certainty.

*Kirkpatrick v. Strosberg*, 385 Ill. App. 3d 119, 130 (2d Dist. 2008); *see also R.E. Davis Chem.*

*Corp. v. Diasonics, Inc.*, 924 F.2d 709, 710, 712 (7th Cir. 1991) (upholding breach-of-contract

damages award for seller despite the buyer's contention that the damages calculations were

inconsistent with other figures presented by the seller during litigation).  Frazee's opinion is not

inadmissible *ipse dixit*.

*     *     *

Omega's motion to exclude is granted in part and denied in part.  We preclude Hunter

from relying upon the Requested Documents and information provided by Somi Jalal and

preclude Frazee from giving expert testimony that relies upon these excluded documents and

information.  We further preclude Frazee from giving expert testimony about Categories 2, 3,

and 4 of damages.  Subject to the foregoing and any subsequent evidentiary rulings, Frazee may

provide expert testimony on damages if this case goes to trial.

## II.    Motions for Summary Judgment

We now turn to the parties' motions for summary judgment.  Summary judgment is

appropriate "where there is no genuine dispute as to any material fact and the moving party is

entitled to judgment as a matter of law."  *Giles v. Godinez*, 914 F.3d 1040, 1048 (7th Cir. 2019).

Where opposing parties both move for summary judgment, we treat each motion separately,

construing the evidence and drawing "all reasonable inferences in favor of the party against

31

whom the motion under consideration is made." *Marcatante v. City of Chicago*, 657 F.3d 433, 438–39 (7th Cir. 2011); *Jefferson v. United States*, 546 F.3d 477, 480 (7th Cir. 2008) (quotation marks omitted). "On summary judgment we do not weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). "We have one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* (quotation marks omitted).

The parties agree that Illinois substantive law governs Hunter's breach-of-contract claim. (*See* Def.'s Summ. J. Mem. at 3; Pl.'s Summ. J. Mem. at 4–5.) To prove a claim for breach of contract in Illinois, "the plaintiff must show: (1) the existence of a valid and enforceable contract, (2) [the plaintiff] substantially performed the contract, (3) the defendant breached that contract, and (4) damages resulted from the alleged breach of contract." *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 886 (7th Cir. 2018).

### A.      Omega's Motion for Summary Judgment

Omega presents three arguments in support of its motion for summary judgment. First, it argues that Hunter's breach-of-contract claim "is barred by the first breach rule." (Def.'s Summ. J. Mem. at 2.) Second, it argues that Hunter cannot prove damages with reasonable certainty. (*Id.*) Third, it argues that we should not allow Hunter to seek damages related to transactions other than the June 2018 Purchase Order. (*Id.*) In considering these arguments, we construe the evidence and draw all reasonable inferences in Hunter's favor. *Jefferson*, 546 F.3d at 480.

### 1.      First Breach Rule

Omega contends that under the "first breach rule," it cannot be liable for breach of contract because Hunter materially breached the NCNR by failing to test the MOSFETs and return any that were defective within 30 days of receipt. (Def.'s Summ. J. Mem. at 2, 4.)

Generally, "a party to a contract who commits the first breach of its terms cannot maintain an action for a subsequent breach by the other party." *Daniggelis v. Pivan*, 159 Ill. App. 3d 1097, 1103 (1st Dist. 1987) (quotation marks omitted). This is because the first breach excuses any subsequent performance by the other contracting party. 23 Williston on Contracts § 63:3 (4th ed. May 2022 update). As its name indicates, this rule bars a plaintiff's breach-of-contract claim only if the plaintiff was the *first* party to breach the contract. *See Daniggelis*, 159 Ill. App. 3d at 1103; *Hypergraphics Press, Inc. v. Cengage Learning, Inc.*, No. 08 C 5102, 2009 WL 972823, at *3 n.3 (N.D. Ill. Apr. 8, 2009). Moreover, the plaintiff's breach must be material for the rule to apply. *See Sahadi v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chi.*, 706 F.2d 193, 196 (7th Cir. 1983) ("It is black letter law in Illinois and elsewhere that only a 'material' breach of a contract provision by one party will justify non-performance by the other party."); *Circle Sec. Agency, Inc. v. Ross*, 107 Ill. App. 3d 195, 202–03 (1st Dist. 1982) ("A minor breach . . . will not generally . . . excuse the non-breaching party's duty of counterperformance.").

Thus, for us to enter summary judgment in its favor based on the first breach rule, Omega must show that it is undisputed that (1) Hunter breached the parties' agreement before Omega did, and (2) this breach was material. Omega has not made either showing.

First, a reasonable jury could find that Omega first breached the parties' agreement by delivering defective or counterfeit MOSFETs. To be sure, the NCNR, which both Hunter and Omega signed, required Hunter to report any defective product within 30 days and provide a written technical failure report. (NCNR.) It is also undisputed that Hunter failed to report that the MOSFETs were defective or provide testing results to Omega within 30 days of receiving either batch. (Pl.'s Resp. to Def.'s SOF ¶¶ 24, 28.) But even if these failures breached some aspect of the parties' agreement, Omega's delivery of the first batch of MOSFETs *preceded*

these failures. And there is evidence in the record that a reasonable jury could rely upon to find that this batch of MOSFETs was defective or counterfeit. (*See, e.g.*, Dkt. No. 81-12 at 3 & Dkt. No. 81-13 at 3 (third-party testing reports stating that evidence of counterfeiting was found "with the lot or test samples during the inspection" and recommending that the MOSFETs not be used in any application); Dkt. No. 81-15 at OMEGA_000121 (Feb. 22, 2019 email in which Omega's CEO states, in apparent reference to the MOSFETs, that "our team has acknowledged that this material is questionable"); Dkt. No. 92-23 (Feb. 18, 2019 email in which an Omega employee states that a testing house "found a multitude of failures" in the MOSFETs, "reflecting what [Hunter] has reported to us"); Z. Ochoa Dep. at 75:5–9 (testimony from Omega's manager that the parts Omega obtained for Hunter "failed").) In fact, Omega's argument that Hunter breached the parties' agreement by failing to test and return defective products within 30 days presupposes that the MOSFETs were defective. Moreover, Omega does not dispute that a reasonable jury could find that its delivery of defective or counterfeit MOSFETs breached the parties' agreement. Because a reasonable jury could find that Omega first breached the parties' agreement by delivering defective or counterfeit MOSFETs, the first breach rule does not justify summary judgment in Omega's favor.

Second, Omega has failed to show beyond dispute that any breach by Hunter was material. "[U]nder Illinois law, the materiality inquiry focuses on two interrelated issues: (1) the intent of the parties with respect to the disputed provision; and (2) the equitable factors and circumstances surrounding the breach of the provision." *Arnhold v. Ocean Atl. Woodland Corp.*, 284 F.3d 693, 700 (7th Cir. 2002). The parties' intent is determined by referring to the language of the agreement "and the circumstances surrounding the agreement." *Id.* at 701 (quotation marks omitted). "When considering extrinsic evidence, the factfinder should focus, in

descending order of importance, on: (1) the parties' negotiations over the contract at issue;

(2) their course of performance; (3) their prior course of dealing; and (4) trade usage in the

relevant industry." *Id.* at 701. If the factfinder, after evaluating these factors, determines that the

breached provision "was truly of such significance that the contract would not have been made if

the provision had not been included," it must then "take into account the totality of the

circumstances and focus on the inherent justice of the matter." *Id.* at 700–01. To do so, the

factfinder should consider, at a minimum, "whether the breach defeated the bargained-for

objective of the parties; whether the non-breaching party suffered disproportionate prejudice; and

whether undue economic inefficiency and waste, or an unreasonable or unfair advantage would

inure to the non-breaching party." *Id.* at 701.

　　With respect to the materiality test's initial inquiry into the parties' intent, Omega

contends that the facts establish that it "would not have agreed to provide Hunter with the

[MOSFETs] if Hunter had not signed the NCNR." (Def.'s Summ. J. Mem. at 5.) Omega's

contention addresses only its intent, however, when the relevant inquiry asks about Hunter's

intentions as well. *Arnhold*, 284 F.3d at 700–01. In any event, Omega does not explain why the

identified facts—that Omega asked Hunter to sign the NCNR, that both parties signed the

NCNR, and that Hunter later invoked the terms of the NCNR to oppose a proposed price

increase (Def.'s Summ. J. Mem. at 4–5)—*require* a reasonable jury to find that the parties

intended for the NCNR terms relied upon by Omega to be material. *See IPOX Schuster, LLC v.

Nikko Asset Mgmt. Co.*, 304 F. Supp. 3d 746, 758 (N.D. Ill. 2018) ("Summary judgment [] is

only appropriate when the moving party shows that a reasonable jury must find in its favor.").

　　What is more, "the determination of 'materiality' is a complicated question of fact" that

"depends on the inherent justice of the matter" and involves considering several factors. *Sahadi*,

706 F.2d at 196; *Wolfram P'ship, Ltd. v. LaSalle Nat'l Bank*, 328 Ill. App. 3d 207, 223 (1st Dist. 2001). Consequently, whether a breach is material generally should not be resolved at summary judgment. *Sahadi*, 706 F.2d at 196–97; *Wolfram P'ship*, 328 Ill. App. 3d at 223; *Peoria Partners, LLC v. Mill Grp., Inc.*, No. 15 C 6680, 2015 WL 8989675, at *4 (N.D. Ill. Dec. 16, 2015). Omega's briefing does not convince us that we should make an exception in this case. Notably, the primary case upon which Omega relies, *Arnhold*, involved the Seventh Circuit's review of factual findings made by a magistrate judge after a two-day evidentiary hearing. 284 F.3d at 695, 699. This is a much different procedural posture than summary judgment, where we must view the evidence in the light most favorable to Hunter. *Kotaska v. Fed. Express Corp.*, 966 F.3d 624, 628 (7th Cir. 2020). Thus, the first breach rule does not justify summary judgment in Omega's favor for these reasons as well.

### 2. Reasonable Degree of Certainty for Damages

Next, Omega argues that we should enter summary judgment against Hunter because it "has no competent evidence of its alleged damages." (Def.'s Summ. J. Mem. at 8–9.) Omega contends that (1) Hunter should not be allowed to rely upon Frazee's damages opinion and the Requested Documents for the reasons set forth in its motion to exclude, and (2) Hunter cannot lay the proper foundation to have Addendum A and the Damages Summary admitted at trial under Federal Rule of Evidence 1006. (*Id.*) Without this evidence, Omega continues, Hunter cannot prove damages to a reasonable degree of certainty. (*Id.*; Defendant's Reply in Support of Its Motion for Summary Judgment (Dkt. No. 96) at 3.)

"Merely showing that a contract has been breached without demonstrating actual damage does not suffice, under Illinois law, to state a claim for breach of contract." *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 631 (7th Cir. 2007). To prevail on a breach-of-contract claim, a plaintiff must prove damages caused by the breach "to a reasonable degree of certainty."

*Id.* at 631–32.  Because "[d]amages are an essential element of a breach of contract action," a plaintiff's failure to prove contract damages "entitles the defendant to judgment as a matter of law."  *In re Ill. Bell Tel. Link-Up II & Late Charge Litig.*, 2013 IL App (1st) 113349, ¶ 19.  But we can grant summary judgment on this basis only if Omega shows that no reasonable jury reviewing the current record could find that Hunter suffered *any* damages stemming from the contractual breach.  *See Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021) (the moving party "bears the burden of showing that summary judgment is appropriate"); *Grottkau v. Sky Climber, Inc.*, 79 F.3d 70, 72 (7th Cir. 1996) ("We will affirm a grant of summary judgment only if no reasonable jury would render a verdict for the non-moving party if the record at trial were identical to the record compiled in the summary judgment proceeding." (quotation marks omitted)).

Omega has not met its burden.  Omega has not demonstrated that the non-excluded portions of Frazee's damages opinion fail to provide competent evidence of damages.  For instance, we are not at this point excluding Frazee's initial calculation of the value of "scrapped" End Products that he based on Hunter's quote models.  (*See* Frazee Report ¶¶ 3, 5; Pl.'s Resp. to Def.'s SOF ¶ 68.)  There is also evidence of damages independent of Frazee's expert opinion, Addendum A, and the Damages Summary.  It is undisputed that Hunter paid for the first batch of MOSFETs (Pl.'s Resp. to Def.'s SOF ¶¶ 22–23), and there is evidence in the record that Hunter returned these MOSFETs to Omega without being reimbursed the money it paid for them.  (Tongo Dep. at 36:8–21, 38:11–39:8, 102:4–14; Addendum A.)  Hunter's damages for Omega's breach of the parties' agreement could include at least the amount of money it paid for MOSFETs that it then returned.  *See Ill. Bell Tel.*, 2013 IL App (1st) 113349, ¶ 29 ("The purpose of awarding contract damages is to compensate the injured party.").  Indeed, Omega essentially

concedes that the total purchase price for the MOSFETs ($6,750) could constitute damages arising from its alleged breach of contract. (*See* Def.'s Summ. J. Opp'n at 4 ("Had Hunter tested the MOSFETs right away, instead of waiting until after it finished assembling nearly all of the End Products, its damages would have been $6,750 at most[.]").)

Accordingly, Omega is not entitled to summary judgment based on Hunter's alleged inability to prove damages to a reasonable certainty. That said, if Hunter does intend to introduce Addendum A, the Damages Summary, or any other document into evidence at trial as a summary, chart, or calculation under Rule 1006, it must make the underlying documents available to Omega "at a reasonable time and place" and demonstrate that these underlying documents "are accurate and would be admissible as evidence." Fed. R. Evid. 1006; *United States v. Oros*, 578 F.3d 703, 708 (7th Cir. 2009). If Hunter does not do so, we will consider any appropriately raised pretrial requests for exclusion.

### 3. Damages Related to Non-MOSFET Components

Finally, Omega argues that we should bar Hunter from seeking damages related to Hunter's purchase of components other than the MOSFETs. (Def.'s Summ. J. Mem. at 9–10.) Hunter asserts that these non-MOSFET components, which were not part of the June 2018 Purchase Order, "are non-conforming, counterfeit and therefore defective[,]'" and it seeks nearly $160,000 in damages related to its purchase of these components from Omega. (Pl.'s Resp. to Def.'s SOF ¶¶ 34–36.) According to Omega, Hunter cannot establish that Omega breached any contract with respect to these non-MOSFET components. (Def.'s Summ. J. Mem. at 9–10.) Hunter, however, maintains that these damages are appropriate because once it discovered that the MOSFETs provided by Omega were defective and counterfeit, "*all* of the components Omega procured for Hunter were rendered unreliable and unfit for incorporation into consumer products." (Plaintiff's Response Memorandum of Law in Opposition to Defendant's Motion for

Summary Judgment ("Pl.'s Summ. J. Opp'n") (Dkt. No. 92) at 10.)  In other words, Hunter

contends that Omega's alleged breach of the agreement that involved the MOSFETs rendered

worthless other components that Hunter bought from Omega pursuant to other purchase orders.

"A defendant who has breached a contract is liable only for the damages that the breach

caused." *In re Emerald Casino, Inc.*, 867 F.3d 743, 755 (7th Cir. 2017).  "In Illinois, causation is

referred to as proximate causation and includes two distinct concepts:  cause in fact and legal

cause." *Id.*  "To address cause in fact, we ask whether there is a reasonable certainty that a

defendant's acts caused the injury or damage." *Id.*  Legal cause, in turn, requires the damages to

be "a likely and thus a foreseeable result of the defendant's conduct." *Id.* at 756.  The party

requesting damages bears the burden of showing causation with reasonable certainty. *TAS*

*Distrib.*, 491 F.3d at 633.

Hunter has not met its burden with respect to this aspect of damages.  It does not direct us

to any caselaw suggesting that Omega's delivery of allegedly defective MOSFETs could be the

proximate cause for damages arising from the purchase of other products pursuant to other

purchase orders.  Nor does Hunter point to any evidence showing that the non-MOSFET

components were, in fact, counterfeit or defective, or that the alleged defectiveness of the

MOSFETs rendered the non-MOSFET components worthless.  The sole evidentiary citation

Hunter includes is to deposition testimony from Omega's Manager, who testified that Omega

"blacklisted" the vendor that sold it the MOSFETs "[b]ecause [the vendor] got [Omega] into this

situation."  (Pl.'s Summ. J. Opp'n at 10–12 (quoting Z. Ochoa Dep. at 74:18–75:9).)  But this

testimony has nothing to do with the reliability of the non-MOSFET components that Hunter

bought from Omega.  Furthermore, Hunter does not even show that Omega obtained the non-

MOSFET components from the same "blacklisted" vendor.  Hunter's attempt to use Omega's

alleged contractual breach with respect to the MOSFETs as a basis to obtain damages for other components purchased pursuant to other purchase orders is a bridge too far.  We grant summary judgment for Omega on the damages Hunter seeks for the non-MOSFET components: Murata #GRM2165C1H561GA01D, TDK #C2012X7R1E475K125AB, TDK #C1005X5R1A475K050BC, and Kemet #C0603C475K8PACTU.

### B.    Hunter's Motion for Summary Judgment

Hunter argues that summary judgment is appropriate in its favor on its breach-of-contract claim, "except as to the amount of damages," because (1) "there is no genuine issue of material fact that Omega breached its contract with Hunter by supplying counterfeit component parts to Hunter and, as a result of Omega's breach, Hunter sustained damages," and (2) Omega's affirmative defenses do not bar Hunter's recovery.  (Pl.'s Summ. J. Mem. at 3–4.)  In addressing Hunter's summary judgment motion, we construe the evidence and draw all reasonable inferences in Omega's favor.  *Jefferson*, 546 F.3d at 480.

Hunter bears the burden of proof on its breach-of-contract claim.  *See Swyear*, 911 F.3d at 886.  It therefore "must lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of [Omega] on the claim."  *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015).  If Hunter does not make this showing, we must deny its motion for summary judgment.  *Id.*

Hunter falls short of meeting its burden.  Citing only to a copy of the June 2018 Purchase Order and Hunter's Terms and Conditions, Hunter first asserts that "the existence of a contract is undisputed."  (Pl.'s Summ. J. Mem. at 5 (citing Dkt. Nos. 81-2 & 81-3).)  Similarly, in its statement of undisputed facts, Hunter contends that the June 2018 Purchase Order and the Terms and Conditions "make up the parties' entire contract."  (Pl.'s SOF ¶ 5.)  Yet these two documents

40

at most show an offer by Hunter to enter a contract. They do not show Omega's *acceptance* of the offer, which is necessary to form a contract between the two parties. *Franklin v. Nanavati*, 2020 IL App (2d) 190710, ¶ 26. Hunter cannot prove its breach-of-contract claim without establishing that a contract existed in the first place. *See Swyear*, 911 F.3d at 886.

True, Omega's opposition brief contends that it accepted Hunter's offer "by shipping the MOSFETs and sending invoices for the goods that contained Omega's terms and conditions." (Def.'s Summ. J. Opp'n at 8.) But Hunter had the initial burden to demonstrate the existence of a contract, and its failure to identify Omega's purported acceptance in its opening memorandum dooms its request for summary judgment. *See Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) ("Federal Rule of Civil Procedure 56 imposes an initial burden of production on the party moving for summary judgment to inform the district court why a trial is not necessary."); *Guyton v. Taybron*, No. 18 C 1856, 2020 WL 1027886, at *2 (N.D. Ill. Mar. 3, 2020) (defendants waived arguments for summary judgment that were not raised in their initial memorandum); *Ores v. Willow W. Condo. Ass'n*, No. 94 C 4717, 1998 WL 852839, at *10 (N.D. Ill. Nov. 30, 1998) (denial raised by summary judgment movants for the first time in their reply came "too late for them to meet their summary judgment burden").

Second, Hunter makes no attempt to show that it substantially performed its obligations under the contract that was allegedly formed. (Pl.'s Summ. J. Mem. at 5.) "[A] party seeking to enforce the contract has the burden of proving that [it] has substantially complied with all the material terms of the agreement." *Goldstein v. Lustig*, 154 Ill. App. 3d 595, 599 (1st Dist. 1987). This is a requisite element of a breach-of-contract claim, *Swyear*, 911 F.3d at 886, and Hunter's failure to address it is an additional reason precluding summary judgment in its favor. *See Hotel*

*71 Mezz Lender*, 778 F.3d at 601 (requiring a party moving for summary judgment on a claim it must prove to cite the facts that it believes satisfies the elements of its claim).

Because Hunter has not met its summary judgment burden with respect to its breach-of-contract claim, we need not consider its arguments regarding Omega's affirmative defenses. Hunter's summary judgment motion is denied.

## CONCLUSION

For the foregoing reasons, Omega's motion for summary judgment (Dkt. No. 74) is granted in part and denied in part, Omega's motion to exclude (Dkt. No. 76) is granted in part and denied in part, and Hunter's motion for summary judgment (Dkt. No. 79) is denied in its entirety. Because this case will proceed on Hunter's breach-of-contract claim, the parties shall comply with Local Rule 16.1's instructions regarding the final pretrial order and submit a proposed final pretrial order in the form set forth by Local Rule 16.1. *See* Form LR 16.1.4, Final Pretrial Order Form, available at https://www.ilnd.uscourts.gov/_assets/_documents/_rules/LR16%20Final%20Pretrial%20Order%20Form.pdf. The parties shall submit this proposed order by June 13, 2023. It is so ordered.

Marvin E. Aspen
United States District Judge

Dated: May 2, 2023